UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR L. PARKER,

                Plaintiff,                      Case No. 04-74921

vs.

JO ANNE B. BARNHART,              MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

## OPINION AND ORDER

**I.**      **BACKGROUND**

      Arthur L. Parker brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II. Both parties have filed motions for summary judgment, and have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636(c). For the following reasons, this matter is REMANDED FOR RECONSIDERATION.

      **A.**      **Procedural History**

      Plaintiff applied for DIB on March 27, 2002, alleging that he had became disabled September 24, 2001 (R. 47) due to non-specified conditions affecting his ability to breathe, stand and walk (R. 54). Plaintiff's application was denied initially, and following a hearing before Administrative Law Judge Henry Perez Jr. (ALJ Perez) (R.12-23). The Appeals Council denied Plaintiff's request for review (R. 5-8).

      **B.**      **Background Facts**

### 1.     *Plaintiff's Testimony*

In his *Pain Questionnaire* Plaintiff indicated that he could lift 10-20 pounds, walk one-quarter mile on a level surface without stopping, though walking stairs posed a problem for him, and that he had no limitations in the use of his hands or arms and no limitation in how long he could sit (R. 76-78). His breathing medication sometimes made him sleepy, but he could drive, cook and shower without assistance (R. 78).

At the hearing in this matter Plaintiff testified that his primary pain involved his back, which was aggravated by long periods of sitting or standing. He also has breathing problems and hepatitis C.

He had been wearing a back brace for two years at the time of the hearing. He had difficulty sitting and could not sit for more than an "hour or so" before his back stiffens up and he needed to get up, though his back brace lessened this problem so that he was "basically okay" with the brace on (R. 503). He could stand for an hour or so without pain (R. 491), but then he had to move around and change positions because of the pain in his back (R. 503-504).

Now his breathing problems had been an issue for him for many years, but he was only diagnosed with pneumonia in 1999 (R 487). He could walk "a block or so .... and back" without his inhalers (R. 488).[1] The biggest barrier to his walking more was his breathing problems (R. 491).

He had developed cirrhosis due to hepatitis C. He took himself off his pain medications, Vioxx and Lipitor, after learning about possible side effects affecting the liver (R. 489-490). He planned to start to taking over-the-counter medication for his arthritis to replace the medicine he had

---

[1]Plaintiff later testified that his mailbox was a block away and he could only make it to the mailbox before he was short of breath (R. 503).

stopped taking (R. 491). He was taking Xanax for depression and anxiety. At times he used Vicodin for his back pain, and a combination of ice and heat for his arthritis. He also attended physical therapy for his back which helped "a little bit" (R. 490). His wife assisted him with a physical therapy program at home, which consisted of stretching his legs (R. 491).

He had surgery on his right knee in 1979 due to torn ligaments and cartilage damage (R. 492). When he had attended therapy for the knee he was told that they may have to reenter the knee "because [he had] waited so long." The knee bothered him when he stood or walked. He could not stand on his right leg at all without pain.

He had trouble sleeping and got about three or four hours per night (R. 492-93). If he did not sleep well at night he napped during the day, but if he napped too long during the day he could not sleep at night (R. 493). The Xanax did help him to sleep but he was trying to wean himself off of this medication.

His activities consisted of watching television, swimming (in the summer), fishing (a couple times a month), walking, going to the store to buy himself something to eat or accompanying his wife when she buys other things and taking out the garbage, which weighed approximately 10 pounds (R. 493-495 and 500). He stated that he was afraid to lift 20 pounds for fear of injuring his back (R. 499-500), but agreed that he is able to do so (R. 504). If he tried to lift more he felt a stinging pain in his back. He did not help with the household chores, but stated that this was because his wife was particular about the way things were to be done (R. 505). When asked whether there was anything preventing him from helping he answered "no," apart from the fact that his vacuum cleaner was too heavy and caused him pain when he used it. He felt weak and tired and his stomach hurt (R. 512). In order to relieve these symptoms he would relax and lay down most of the

3

day.  He would lie down and watch television for 2 hours at a time 3 or 4 times a day, and also took naps (R. 513).

Dr. Madretta treated Plaintiff for his asthma and Dr. Sherman was his primary physician (R. 495-96).  He was taking Vicodin on an as needed basis for pain which helped a lot (R. 496-97).  He also took Hyzaar for high blood pressure, Protonox, K-10, Advair, Terbutaline Sulfate, thiamine, Cardizem, Albuterol, Intal inhaler, Dovonex, potassium, a nebulizer (3 times per week), and an oxygen tank (R. 498-99).  He used his inhalers and his oxygen daily (R. 499).

## 2. *Medical Evidence*

### *Medical Records Before Insured Status Expired on July 28, 2004*

On May 2, 1999, Plaintiff was admitted to the hospital for seven days after a chest x-ray showed bilateral apical infiltrate (R. 96-117).  Plaintiff had been complaining of shortness of breath and fatigue for months, and had recently been diagnosed with asthma (R. 96).  The final diagnosis was alcohol abuse; chronic obstructive asthma, with status asthmaticus; opioid abuse unspecified use; gastritis; simple pneumonia and pleurisy (R. 99).

A July 12, 1999, chest x-ray indicated no evidence of infiltrate, pleural effusion or pneumothorax, but note was made of right apical bulla and right apical scarring (R. 130).

A July 15, 1999, chest x-ray indicated that his pulmonary vasculature were within normal limits with no focal consolidation, pnuemothroax or pleural effusion identified (R. 129).

On August 15, 2000, Plaintiff visited the emergency room complaining of chest pain (R. 134-140).  He was observed to be pain free in the emergency room and his stress test came back negative.  His physical examination revealed no abnormal findings and the diagnosis was "atypical chest pain" and "questionable gastritis."

4

On August 18, 2000, Plaintiff visited the emergency room complaining that he had trouble breathing after going up stairs (R. 131). He stated that his chest felt heavy and that he had a cough but no wheezing. He was a little dizzy earlier in the day and complained of abdominal cramping that had been going on for several months. The physical examination revealed no distress, no trauma, clear lungs, equal breath sounds, regular heart rate, normal sinus and rhythm, slightly tender abdomen upon palpation, full range of motion in the musculoskeletal system with normal tone and strength (R. 131-32). A chest x-ray was taken which revealed no pneumonia (R. 132). The final diagnosis was acute gastritis.

An August 30, 2000, endoscopy with CLOtest revealed a histal hernia with reflux esophagitis after Plaintiff complained of abdominal pain and gastrointestinal bleeding (R. 148-49). A colonoscopy, biopsy and polypectomy were also completed (R. 150-51).

Largely illegible notes from office visits to Virender K. Mendiratatta, M.D. dated September 10, 2000, to October 15, 2002, are included in the record. Occasional words can be made out such as, trouble with asthma - October 15, 2002, (R. 165); emergency kit for asthma - May 8, 2002, (R. 167); short of breath and weak - June 17, 2002; short of breath and unable to sleep - October 10, 2001(R. 171), and short of breath, unable to walk, up whole night - September 19, 2001 (R. 172).

A September 25, 2000, pulmonary function report indicated small airways obstructive defect, with normal lung volume limits and diffusion capacities and significant response to bronchodilator (R. 183).

Dr. Mendiratatta had a June 19, 2001, chest x-ray taken which revealed that Plaintiff had no active disease (R. 175).

A July 2, 2001, pulmonary function report indicated no obstructive defect by the FEV1/FVC

ratio, but revealed a moderate restrictive lung defect and diffusion capacity within normal limits (R 179).

An October 10, 2001, electromyography exam of Plaintiff's lower extremities revealed normal nerve conduction, no abnormal spontaneous activity and normal motor unit action at rest and with effort (R. 289).

A November 3, 2001, echocardiogram produced normal findings (R. 284).

A December 12, 2001, colonoscopy and biopsy was negative other than a small hyperplastic polyp on the rectum which was removed (R. 141). Plaintiff had been having some reflux symptoms and epigastric abdominal discomfort and history of colonic polyp (R. 141) and peptic ulcer disease (R. 143).

On January 22, 2002, Dr. Mendiratatta completed a *Supplementary Report of Claim For Sickness And Accident Benefits Form* regarding Plaintiff and indicated that Plaintiff had a primary diagnosis of exacerbation of asthma and a secondary diagnosis of high blood pressure (R. 208). Dr. Mendiratatta considered Plaintiff disabled from work as of January 22, 2002, through February 28, 2002.

On March 15, 2002, Dr. Mendiratatta completed a *Supplementary Report of Claim For Sickness And Accident Benefits Form* regarding Plaintiff and indicated that Plaintiff was diagnosed with asthma and high blood pressure and was permanently disabled from any work as of September 26, 2001, including any light sedentary work (R. 205-206).

A March 29, 2002, neck and thorax CT was completed to locate the source of Plaintiff's airway obstruction (R. 254-55). Both studies were negative and revealed no pathological enlargements or airway obstruction.

6

An April 17, 2002. Electromyography study of Plaintiff's upper extremities revealed normal nerve conduction, no abnormal spontaneous activity and normal motor unit action at rest and with effort (R 286).

On September 19, 2002, Plaintiff was seen by Mary C. Wood, M.D. (R. 156). His chief complaint was asthma, which he reported having developed after pneumonia in 1999. He gets short of breath when he climbs stairs, walks on hill or talks a lot. He slept on two pillows. He had a daily non-productive cough. His asthma is severe and causes him to go to the emergency room frequently and to his doctor's office twice a month. He claimed that he could not do anything because he got tired too fast. He stated that he used to have pain in his right knee and in his back when he was working but that it was no longer present. He used to smoke on the weekends until 1997 and used cocaine in 1993 (R. 157). Upon physical examination Dr. Wood found Plaintiff to have normal breath sounds with slight wheezing, the pulmonary studies showed a moderate to severe obstructive and restrictive defect with slight improvement after bronchodilator (R. 158-59). Dr. Wood's diagnosis was bronchial asthma with a response to treatment (R. 159).

On October 9, 2002, a Department of Disability Services (DDS) physician completed a *Physical Residual Functional Capacity Assessment Form* regarding Plaintiff (R. 88-95). The DDS physician believed that Plaintiff had the RFC to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, occasionally climb, and needed to avoid extreme cold/humidity/fumes.

On or about December 4, 2002,[2] Plaintiff began a psychological counseling program (R.

_____

[2]The therapist's discharge comments say that Plaintiff came into this program on this date (R. 374), but his initial assessment form is dated September 15, 2003 (R. 340)

7

374).  He was originally diagnosed with Axis I - alcohol dependency, major depression single episode severe without psychotic features, low self esteem, low frustration tolerance and inability to delay gratification, Axis III - physical problems as described above, and Axis VI - severe family, marital, emotional and communication issues (R. 374, 361).  He complied with the program, made a change in his attitude and his therapist suggested that he be graduated from the program on July 21, 2003 (R. 374).  He was advised to involve himself in ongoing support services and continue to be medically monitored (R. 371).

On January 23, 2003, Plaintiff underwent a stress test with Cardiolite myocardial perfusion imaging with Dr. Sherma (R. 269, 270).  The test revealed that Plaintiff had diminished exercise tolerance secondary to exercise-induced arrhythmia, hypertensive blood pressure response to exercise and an occasional PVC spike at peak exercise and a normal ejection fraction.  Ischemia could not be determined because Plaintiff's baseline ECG was abnormal.

A March 28, 2003, endoscopy, biopsy, CLOtest and colonoscopy revealed a small uncomplicated hiatal hernia, superficial prepyloric gastric ulcer, antral gastritis, hemorroids and a small hyperplastic polyp in the sigmoid colon, which was removed (R. 268, 258-263).  The biopsy results were negative for H. pylori (R. 264).

An April 19, 2003, echocardiogram was normal (R. 253).

A June 5, 2003, MRI of Plaintiff's right knee revealed degenerative changes of the medial meniscus with a tiny perimeniscal cyst, likely secondary to a small tear of the posterior horn of the medial meniscus; contusion in the anterior lateral aspect of the tibial plateau; increased fluid surrounding the lateral collateral ligament making a partial tear unable to be excluded; and a small questionable area in the metaphyseal portion of the distal femur where trauma or fibroma could exist

8

(R. 251-52).

An August 20, 2003, electromyography exam of Plaintiff's lower extremities was deemed abnormal (R. 250). Findings suggested evidence of bilateral L4-5 radiculopathy and/or spondylosis. An August 23, 2003, MRI of the lumbar spine showed no evidence of neurological impingement at L5-S1 (R. 248-49). A tiny disc protrusion was seen at L4-5 which impresses on the thecal sac and narrows the neural foramen, but does not appear to be causing neurologic impingement (R. 249). There was also a circumferential bulge at L5-S1 and facet arthritis from L3-4 to L5-S1.

An October 31, 2003, MRI of Plaintiff's brain, completed in response to Plaintiff's complaints of headaches, revealed no abnormal findings (R. 245).

On December 7, 2003, Plaintiff was discharged from Henry Ford Medical Center's emergency department with a diagnosis of "probable bronchospasm" (R. 211-214). Only the discharge instructions from this visit are included in the record. He was released with prescriptions for an Albuterol inhaler, Biaxin (an antibiotic), Prednisone and a spacer device, as well as instructions to rest at home for 2-3 days if symptoms were severe (R. 211).

Largely illegible office visit notes from N. Sherma, M.D. dating from February 29, 1995, through December 22, 2005, are included in the record (R. 217-231). Occasionally one can make words or phrases in these notes, such as the following:

- falling apart, back pain radiating to legs, chest pains, shortness of breath, cough, back spasm, decreased range of motion - February 19, 1995 (R. 231)
- back pain since Wednesday - August 29,1997 (R. 230)
- weak, tired, weight loss, shortness of breath on minimum exertion - June 8, 1998
- feels much better, lungs clear now wishes to go to work - April 21, 1999 (R. 229)
- shortness of breath doing better, back pain and legs continue -June 15, 1999
- shortness of breath better - August 2, 1999 (R. 228);
- back pain severe - November 19, 1999;
- sprained back moving furniture, decreased range of motion - January 24, 2000 (R. 224);

- feels better, lungs clear - August 25, 2000;
- continuing shortness of breath on even talking - December 8, 2001 (R. 221);
- continue shortness of breath, palpitation - July 11, 2002 (R. 222);
- continuing symptoms, shortness of breath, anxious - January 15, 2002
- still coughing, short of breath, severe back pain, instability -December 24, 2002
- 2-3 weeks ago jumping a fence right knee pain - May 31, 2003 (R. 218);
- severe back pain couple of weeks - July 22, 2003;
- back pain continues though some improvement with PT, exam better range of motion - September 4, 2003 (R. 220)[3];
- increasing back pain, back spasm and decreasing range of motion - December 22, 2003 (R. 217);
- weak, tired, back pain, knee pain, decreased drinking, lungs clear, short of breath - January 20, 2004;

A January 20, 2004, blood test revealed that Plaintiff was positive for the Hepatitis C antibody (R. 216, 236).

On March 16, 2004, Plaintiff visited Ahmad H. Abu-Rashed, M.D. for an evaluation of his abnormal liver enzymes and Hepatitis C (R. 451). Dr. Abu-Rashed reported that Plaintiff was still consuming alcohol at this date. Dr. Abu-Rashed gave Plaintiff some material to read about his condition and recommended that he have a liver biopsy and a CAT scan to rule out carcinoma.

On April 2, 2004, Plaintiff underwent a liver biopsy (R. 453), and the pathology of the biopsy indicated hepatic cirrhosis with HCV chronic hepatitis, portal and lobular chronic inflamation (grade 4) and portal and septal fibrosis with regenerative nodules (fibrotic stage 4) (R. 452).

Plaintiff visited Dr. Abu-Rashed on April 6, 2004, and discussed the findings of cirrhosis in the biopsy (R. 451). Dr. Abu-Rashed recommended Inteferon for the treatment of his hepatitis C, and suggested that another appointment should be made to discuss the benefits and side-effects.

On May 6, 2004, Plaintiff visited Dilip K. Moonka, M.D. in the liver clinic at Henry Ford

---

[3]Also, under a section where Dr. Sherma appears to write his treatment notes he wrote "back brace" (R. 220).

Hospital (R. 458). Dr. Moonka noted that Plaintiff quit drinking alcohol two months ago, had chronic low back and right hip pain, used oxygen at home, had a good appetite, stable weight, no headache or abdominal pain.  Upon physical examination Dr. Moonka noted that, despite cirrhosis, his liver disease appeared "surprisingly well compensated with a normal or near normal albumin, biblirubin, and pro-time.  In fact, even the patient's platelet count is normal."   She spoke with Plaintiff about treatment and indicated that a combination of Interferon, which is injected once per week and Ribavirin pills, which are taken twice a day would be tried for 12 weeks and then blood work would be done to see if there had been a response.  If he had a positive response he would get a full 48 weeks of the therapy.  Cure rates with this treatment were 35%.  She was not clear whether his pulmonary condition would withstand Interferon.

<em>Medical Records Before Insured Status Expired on July 28, 2004</em>

Plaintiff moved to Phoenix, Arizona and, on June 24, 2004, visited Gavin Levinthal, M.D. and indicated that the only medication he was taking was Hyzaar, a breathing medication (R. 469). Upon physical examination Dr. Levinthal noted that Plaintiff had no obvious cutaneous stigmata of chronic liver disease; no pedal edema and no jaundice (R. 470). He had good air entry with no crackles or wheezes.  Dr. Levinthal discussed the benefits and risks of Interferon therapy and recommended that Plaintiff undergo 12 weeks of therapy and, if successful, continue for 48 weeks.

On July 6, 2004, Plaintiff expressed concern over starting the Interferon treatment due to side effects and Dr. Levinthal discussed the side effects and how to manage them (R. 468).  Dr. Levinthal prescribed an antidepressant, Paxil, and Plaintiff decided to begin treatment at the end of the month.

*Appeals Council Evidence* [4]

On October 15, 2004, Plaintiff complained to Dr. Levinthal of loss of appetite, nausea, inability to sleep and stated that he felt like he was going out of his head (R. 462). He stated that his sister was schizophrenic and he wanted help, but did not want drugs that would make him a "Zombie."

In a letter dated October 19, 2004, Margie Amity, RN, ANP-C, for Dr. Levinthal, notes that Plaintiff is unable to work because he is receiving Interferon and Ribivirin treatment for hepatitis C, which causes fatigue, depression and general malaise, and that the treatment is scheduled to last 48 weeks, and that he is also receiving psychiatric treatment for his depression and anxiety (R. 461). The letter then mentions that his family has a history of schizophrenia.

On October 22, 2004, Plaintiff began his 48 week course of Interferon therapy (R. 466-67).

### 3. *Vocational Evidence*

The Vocational Expert Christian R. Barrett testified at Plaintiff's administrative hearing. VE Barrett stated that Plaintiff was considered a younger person with a high school education, with no transferrable skills and described his last work as a paint shop inspector as unskilled light work (R. 514). ALJ Perez asked VE Barrett to consider whether a hypothetical person of Plaintiff's age, education, and work experience who had could perform semi-skilled work with the following exertional limitations could perform Plaintiff's past work: lifting 20 pounds occasionally and five pounds frequently, occasional climbing and avoid concentrated exposure to respiratory irritants,

---

[4] *Cotton v. Secretary*, 2 F.3d 692 (6th Cir. 1993), holds that evidence submitted to the Appeals Council for the first time cannot be considered under a § 405(g) review on the sufficiency of the evidence, but only as related to whether the evidence is new and material warranting a remand.

extreme cold and humidity (R. 515). VE Barrett responded that the pollutants in the air at all of Plaintiff's past jobs would be preclusive. When questioned whether there would be other work that such an individual could perform at the light, unskilled level, VE Barrett answered that there were 8,000 inspection, packaging and sorting jobs in the Metropolitan area (15,000 in Michigan) that would qualify.

When asked whether there were jobs available that one could perform if they had the exertional impairments testified to by Plaintiff, if his testimony were considered credible and supported by medical evidence, VE Barrett responded that Plaintiff's exertional limitations regarding sitting, standing, walking and lifting would limit him to "bench-type operations" with a sit/stand option at the light exertional level, of which there were 12,000 in the area (R. 515-16). VE Barrett testified that giving credence to Plaintiff's non-exertional limitations would preclude all work, because the frequency and severity of the pain, shortness of breath and fatigue with minimal exertion, and necessity to lay down 3-4 times per day "would seem to preclude him from sustaining any kind of gainful activity sufficient to complete a workday or a workweek" (R. 516).

### 4.    The ALJ's Decision

ALJ Perez determined that Plaintiff was 49 years old, had a high school education (R. 22) and formerly worked as a body shop worker, welder, emissions tester, mechanic and repair worker (R. 15). Plaintiff was considered a younger individual (R. 22). Plaintiff had not engaged in substantial gainful employment since the onset of disability and met the special status requirements of the Act through the date of his decision.

Plaintiff had the medically determinable impairments of asthma, hepatitis C, a history of lumbar strain, degenerative disc disease of the lumbar spine and a history of right knee surgery in

1979 exacerbated by a fall in May 2003 (R. 22).  Plaintiff's impairment and resulting pain did not

meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4.

ALJ Perez found that Plaintiff's allegations regarding his limitations were not wholly credible.

Plaintiff had a residual functional capacity (RFC) to perform the requirements of limited range

of light work with the following specific functional limitations: lift and carry 10 pounds frequently,

20 pounds occasionally; occasionally climb; avoid concentrated exposure to respiratory irritants, cold

temperatures and humidity.

Plaintiff was unable to perform his past work and did not have any work skills that were

transferrable within his RFC.

Using the Medical-Vocational Guidelines as a framework for decision making and

considering the VE's testimony regarding the number of jobs available, ALJ Perez found that there

were a significant number of jobs in the national economy that Plaintiff could perform and he was,

therefore, not disabled.

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited

the scope of review to a determination of whether the Commissioner's decision is supported by

substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d

803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because

substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]   A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.    Factual Analysis

Plaintiff argues that the Commissioner (a) failed to properly assess his credibility and (b) placed too much weight on the state agency physician's assessment.

The standard for an administrative law judge's credibility finding is as follows:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding

---

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

> on credibility, supported by the evidence in the case record, and must
> be sufficiently specific to make clear to the individual and to any
> subsequent reviewers the weight the adjudicator gave to the
> individual's statements and the reasons for that weight. This
> documentation is necessary in order to give the individual a full and
> fair review of his or her claim, and in order to ensure a well-reasoned
> determination or decision.

S.S.R. 96-7p.

Because an ALJ can evaluate a Plaintiff's demeanor at the in-person testimony, reviewing

courts are limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were

reasonable and supported by substantial evidence in the record. *Jones v. Comm'r Soc. Security*, 336

F.3d 469, 476 (6th Cir. 2003).

ALJ Perez determined that Plaintiff's allegations were not wholly credible and explained this

finding in the body of his decision by referring to what he perceived as discrepancies testified to by

Plaintiff:

(a.) Plaintiff's claim that he was prescribed tank oxygen (R. 19). Plaintiff took issue with this matter

in his brief but failed to point out where the support exists. A review of the record did not

specifically confirm a prescription for oxygen, but it does confirm that he reported use of oxygen at

home on May 6, 2004, when he saw Dr. Moonka (R. 458).

(b.) Plaintiff's claim that his back pain required that he wear a back brace (R. 19). Plaintiff again

took issue with this matter. While he failed to point out where in the record there was support for his

contention that he had been prescribed a back brace, a review of the record did reveal a reference by

Dr. Sherma to a back brace on September 4 and again on October 2, 2003 (R. 220).

(c.) Plaintiff continued to smoke despite his breathing problems (R. 19). For this proposition ALJ

Perez refers to an exhibit in which Plaintiff indicates to his therapist in September 2003 that he

smokes "0" packs per day, but the ALJ may have interpreted the 0 as a 9 due to poor handwriting in

this exhibit (R. 345).

(d.) His back and knee problems show minimal degeneration and no significant treatment has been recommended (R. 19).

(e.) Plaintiff alleged severe fatigue, but his "most recent medical examination on May 6, 2004, did not indicate any significant complaints of fatigue or significant abnormalities" (R.20). He also noted Plaintiff's weight was stable and he had a good appetite. While this is correct, it is unclear what questions Dr. Moonka asked in this examination regarding further evaluation and treatment of Plaintiff's cirrhosis and hepatitis C (R. 458-60). Dr. Moonka noted Plaintiff's breathing difficulties, and the medical record has substantial evidence of Plaintiff's pulmonary problems limiting his activities.

The Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See*

17

*Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986). While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain. Section 404.1529(c)(2),[6] *see also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

*Jones v. Commissioner,* 336 F.3d 469, 476 (6thCir. 2003), notes that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. The ALJ must say more than that the testimony on pain is not credible. *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's

----

[6] 29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id.* at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.* The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

While ALJ Perez refers to 20 C.F.R. 404.1529(a) and SSR 96-7p it is not clear he complied with them. His credibility finding is based on three justifications that a careful reading of the record indicate were problematic if not incorrect and which appear to have been unfairly interpreted – the back brace, oxygen, and misstatement that the record supported a finding that Plaintiff was still smoking. Given all of these errors or mischaracterizations of the record, this credibility finding does not appear to meet the standards of 20 C.F.R. 404.1529(a) and SSR 96-7p.

Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); *see also* 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their

19

claims).

Here, Plaintiff contends his most severe impairments relate to his breathing limitations, back pain and hepatitis. There is substantial objective and clinical diagnostic evidence of underlying degenerative back problems at L4-5 and L5-S1 (R. 248- 50), as well as his pulmonary and liver problems confirming his diagnosis of an "underlying medical condition" sufficient to meet the first part of the *Duncan* test. As in most cases, there is no objective evidence of the exact degree of the limiting symptoms of pain, fatigue, breathing limitations. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." His subjective evidence and consistent reporting to treators over the course of several years is central to this analysis. Yet, the evidence here is not unequivocal. There are some inconsistent medical entries, no history of significant medical intervention or surgery for periods prior to the expiration of his insured status, and no prescribed limitations on Plaintiff's activities - at least none that are legible. Also, the state agency physician's October 2002 Residual Functional Capacity Assessment form concludes that Plaintiff can perform a limited range of light work, as Plaintiff argues hat report was based on dated and incomplete data (R. 88-95). (Dkt. 6, pp. 8-9).

SSR- 96-6p directs that an ALJ *must* consider and address the decision of state agency consultants in their opinions as medical opinions from non-examining sources, and should obtain an updated medical opinion from a medical expert to supplement a state agency medical consultant *only when the ALJ believes* that a finding of medical equivalence is required (SSR 96-6p, p. 3-4). It also requires an updated medical opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical

20

. . . . consultant's finding that the impairments is not equivalent in severity to any impairment in the Listing of Impairments."

Here, ALJ Perez adopted the October 2002 report (R. 20). Yet, subsequent objective medical tests revealed changes in Plaintiff's medical condition which the state agency evaluator did not have when making his determination, i.e. the June 5, 2003, right knee MRI showing a small tear, swelling and possible trauma (R. 251-52); the August 20, 2003, lower extremity EMG suggesting L4-5 radiculopathies and/or spondylosis (R. 250); the August 23, 2003, lumbar spine MRI showing L4-5 disc protrusion, L5-S1 circumferential bulge and facet arthritis from L3-4 to L5-S1 (R. 248-49); and the positive hepatitis C test of January 20, 2004 (R. 216). These additional data not available to the state evaluator weaken the currency and reliability of the report, particularly with regard to Plaintiff's back impairment, and suggest an updated evaluation would be appropriate.[7]

This is the only expert opinion that suggests Plaintiff could do a limited range of light work as ALJ Perez found. Given its lack of complete medical data, it cannot serve as substantial evidence for a finding that Plaintiff can perform a limited range of light work at step 5 of the Commissioner's evaluation.

Thus, on the present record, with the questionable credibility findings and a dated and

---

[7] ALJ Perez, with the benefit of all the medical records, found that Plaintiff had medically determinable impairments of asthma, hepatitis C, a history of lumbar strain, degenerative disc disease of the lumbar spine and right knee surgery exacerbated by a May 2003 fall (R. 18), while the state agency evaluator, without the benefit of all the medical records, found Plaintiff to have only moderate to severe obstructive and restrictive defect and noted no other severe problems (R. 89).

incomplete state evaluator opinion, there is not substantial evidence to uphold the Commissioner's finding and the decision of the Commissioner cannot be upheld.

The remaining question is whether to remand for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). On the present record, it cannot be said that Plaintiff meets these requirements for an award of benefits.

Thus, this matter will be remanded for further proceedings consistent with this Order including obtaining further medical evidence from a medical consultant if the Commissioner wishes to rely on any medical sources other than Plaintiff's treaters, and further equivalence evaluation under the Listing, and a further residual functional capacity evaluation including a more careful credibility assessment consistent with SSR 96-7p and the case law of this Circuit.[8] Any additional evidence from medical consultants, testifying medical advisors or treating sources should consider that the relevant date for establishing disability is on or before July 28, 2004. While medical evidence after

_____

[8]Plaintiff also argued for the inclusion of the medical records which postdated ALJ Perez's decision in this matter. This issue was not addressed due to the recommendation that this matter be remanded on the grounds stated. This matter would not have been recommended for remand based solely upon the availability of the new evidence had there been an adequate credibility finding and a more reliable or current evaluation from the state evaluator.

that date can be relevant,[9] it is limited and less reliable than medical evidence prior to the expiration

of insured status.  On remand, Plaintiff can also obtain additional records or verification concerning

his back brace, need for oxygen, and smoking status.

## III.    ORDER

For the reasons stated above, this matter is Reversed and REMANDED FOR RECONSIDERATION.


SO ORDERED.

Dated: November 30, 2005                          s/Steven D. Pepe
Ann Arbor, Michigan                               United States Magistrate Judge






<u>Certificate of Service</u>

I hereby certify that copies of this Opinion and Order were served upon the attorneys of record by electronic means or U. S. Mail on November 30, 2005.

s/William J. Barkholz
Courtroom Deputy Clerk



---

[9] *Martonik v. Heckler,* 773 F.2d 236, 240 (8th Cir. 1985) (medical evidence after insurance cut-off must be considered to the extent it illustrates claimant's health before that date; *Ellis v. Schweiker,* 739 F.2d 245, 247-49 (6th Cir. 1984); *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988); *Basinger v. Heckler,* 725 F.2d 1166, 1169-70 (8th Cir. 1984); *Parsons v. Heckler,* 739 F.2d 1334, 1340 (8th Cir. 1984); *Boyd v. Heckler,* 704 F.2d 1207, 1211 (11th Cir. 1983) (treating physician's opinion is entitled to significant weight even though he did not treat the claimant until after the relevant determination date).

23